**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**FIRST UNITED BANK & TRUST,**

        **Plaintiff,**

**v.**                //      **CIVIL ACTION NO. 1:11CV31**

**THE SQUARE AT FALLING RUN, LLC,
a West Virginia Limited Liability Company,**

        **Defendant.**

## ORDER AND REPORT AND RECOMMENDATION/OPINION

### I. INTRODUCTION

On March 22, 2011, the plaintiff, First United Bank & Trust [First United], filed an Emergency Motion for Appointment of a Receiver [DE 6] requesting that the Court appoint a receiver to protect its security interest in a lease [Ground Lease] between the defendant, the Square at Falling Run, LLC [Falling Run] and the City of Morgantown Building Commission [Morgantown Building Commission]. On the 29th day of March 2011, the plaintiff, First United Bank & Trust [First United], by counsel, and the defendant, the Square at Falling Run [Falling Run], by counsel, appeared[1] at a hearing, all pursuant to First United's emergency motion, which motion was referred to the Undersigned by Order of the District Judge entered April 23, 2011 [DE 7]. At the hearing, the Court received exhibits, and heard testimony from witnesses and arguments from counsel. Upon the conclusion of the hearing, the Court closed the record and took the matter under consideration.

---

[1] Attorney Edward Kohout appeared for Falling Run and the Warner Brothers, principals of Falling Run and the guarantors of a $2,480,000 non-revolving commercial line of credit. Attorney Kohout filed a Special Appearance and Motion To Dismiss challenging the Court's jurisdiction based on alleged lack of diversity. Mr. Kohout fully participated in the hearing of March 28, 2011.

## II.  FINDINGS OF FACT

Based on the evidence presented at the hearing, the Undersigned makes the following findings of fact by a preponderance of the evidence. *See Miller v. Van Schaick*, 6 F. Supp. 633, 637 (S.D.N.Y. 1934).

1)  The documents attached to First United's complaint, including the Ground Lease [DE 3-5] [Exhibit 1], Credit Line Leasehold Deed of Trust [DE 3-4] [Exhibit 2], the Loan Agreement [DE 3-1] [Exhibit 3], the Promissory Note [DE 3-2] [Exhibit 4], and the Commercial Guaranty [DE 3-3] [Exhibit 5], and the documents introduced at the hearing, including the Memorandum of the Ground Lease [Exhibit 6], the amended Ground Lease [Exhibit 7], the Tax Map [Exhibit 8], and the Appraisal Report [Exhibit 9] submitted post-hearing as directed by the Undersigned, were all admitted in evidence either without objection or by stipulation, and are accurate and authentic.  The signatures appearing in them are not in dispute.

2)  Falling Run is a West Virginia limited liability company.  Its principals are Benjamin F. Warner, Andrew Warner, Monroe Warner, and Christian Warner [collectively, the Warners].  Its Articles of Organization were revoked by the West Virginia Secretary of State effective November 2, 2009.

3)  The Warners are also the principals of McCoy 6 Apartments Limited Liability Company [McCoy 6], Augusta Apartments, LLC [Augusta], Grand Central Building Limited Liability Company of Morgantown [Grand Central], New Creek, LLC [New Creek], and Battle Hill, LLC [Battle Hill] [collectively, the Warner entities].

4)  Several of the Warner entities, including McCoy 6, Augusta, and Grand Central, are

debtors in a Chapter 11 bankruptcy proceeding pending in the Northern District of West Virginia [the related bankruptcies].

5) Robert L. Johns [Johns] is the Chapter 11 trustee in the related bankruptcies.

6) Johns has been approved and has served without issue as a Bankruptcy Trustee by Orders of the United States Bankruptcy Courts for the Northern and Southern Districts of West Virginia.

7) Johns is qualified to be appointed to serve as a receiver for Falling Run.

8) Prior to the financial collapses of the Warner entities, the Warners had schematic type plans to complete an extensive development near the downtown campus of West Virginia University. These plans, which are limited to architect's renderings of what the project might look like on completion, envisioned use of lands in and along the Falling Run Road area of Morgantown as a new gateway into Morgantown from Route 705. It envisioned an underground parking garage which would serve as a foundation for the construction of buildings, roadways, and green spaces above.

9) As part of these schematic plans (primarily architectural renderings), on April 17, 2008, Falling Run and the Morgantown Building Commission entered a lease agreement known as the Ground Lease [DE 3-5]. Pursuant to the Ground Lease, Falling Run had the right to lease certain parcels of real estate owned by the City of Morgantown [Leased Premises] for $1.00 per year until July 1, 2026. After that date, Falling Run would be required to purchase the Leased Premises for $4,305,466.86, or begin paying $27,375.00 in monthly rent, or $328,500.00 in annual rent. In return, Falling Run took on various development obligations, including an obligation

to construct a "'Parking Garage'[] containing a core facility of at least five hundred (500) motor vehicle spaces ('Core Facility')," on or before April 1, 2011. *See* Ground Lease at ¶ 5(c) [DE 3-5].

10) Pursuant to paragraph 23(c) of the Ground Lease, Falling Run's failure to construct the Core Facility by April 1, 2011, constitutes an "Event of Default."[2]

11) The Warner entities borrowed several million dollars from First United.

12) On December 19, 2008, McCoy 6, Augusta, Grand Central, New Creek, and Battle Creek [borrowers], signed a Loan Agreement with First United for a $2,480,000.00 non-revolving commercial line of credit. Falling Run, and the Warners, individually, signed the Loan Agreement as guarantors. The borrowers signed a corresponding

---

[2] Paragraph 23(c) provides: "<u>Event of Default</u>. An event of default as used in this Lease shall include the following: (c) Failure by lessee to construct the Core Facility within the time frames provide [sic] for in Paragraph No 5(c)." It must be noted that default under paragraph 23(c) is not the only default relied on by First United. It claimed and proved defaults under the cross-collateralization and cross-default provisions of the various instruments signed at closing and referred to in the closing documents, to wit: Under the Loan Agreement paragraph 3(c) the loan was not repaid by June 29, 2010; paragraph 10(a) failed to make payment due on loan within 10 days of due date in that Falling Run and Borrowers are delinquent two years in payment under loan agreement ($2,480,000) and on the outstanding debt of $10,952,000; Falling Run is liable for the entire indebtedness as defined in the Commercial Guaranty; Falling Run failed to maintain insurance under 5(f) and 5(q) of the Loan Agreement; Falling Run's articles of organization were revoked November 2, 2009, in violation of 5(g) of the Loan Agreement; Under the Credit Line Leasehold Deed of Trust, paragraph 1(c), Falling Run and Guarantors committed waste by collecting rents and failing to account and pay over the same and by failing to construct the Core Facility timely, thus endangering the value of the leasehold; paragraph 5(h) security for the secured debt was impaired by by failing to construct the Core Facility timely endangering the value of the leasehold; paragraphs 1(c) and 5(h) were violated by Falling Run's failure to timely construct parking garage; paragraph 5(a) was violated by failure to make note payment when due; paragraph 5(c) was violated by any default under Loan Agreement, which also constitutes a default under Deed of Trust; and Defaults under Ground Lease: 23(b)failure to pay rents or monies, and 23(c) failure to construct the Core Facility (parking garage).

Promissory Note [DE 3-2], and the guarantors, including Falling Run, signed a Commercial Guaranty [DE 3-3]. Under the Commercial Guaranty, Falling Run promised to perform any covenants, conditions or agreements that the borrowers failed to perform, including making the prompt payment of the amounts due under the Promissory Note.

13) First United advanced approximately $1.1 million to the borrowers under the line of credit.

14) The principal owed on the Promissory Note was due in full on June 29, 2010. To date, it remains unpaid.

15) The Loan Agreement also cross-collateralized and cross-defaulted $10,952,000.00 that First United lent the borrowers on prior dates. *See* Loan Agreement, ¶ 9.

16) To provide security for its obligations as a guarantor, Falling Run executed a Deed of Trust (DE 3-4), which granted Brian D. Gallagher as Trustee, Falling Run's right, title, interest and estate in the Ground Lease.

17) The Deed of Trust lists First United as the "Lender" and "Beneficiary" of it.

In pertinent part, the Deed of Trust provides that, if an "Event of Default" occurs, the

> Trustee or Lender may forthwith, without notice, separately or jointly: . . . (ii) have a receiver appointed by any court having jurisdiction to take charge of the Property and collect, receive and apply the rents, issues and profits thereof.

Deed of Trust at ¶ 6(a)(ii) (DE 3-4).

19) "Events of Default" under the Deed of Trust include Falling Run's failure to honor its obligations as a guarantor of the Promissory Note, and impairing the security of

the secured debt. *Id.* at ¶ 5(a), (h).

20) Falling Run has no plans or means to begin constructing the Core Facility by April 1, 2011, as required by the Ground Lease, or any date thereafter. Christopher Fletcher [Fletcher], Director of Development Services for the City of Morgantown, testified that he is familiar with Falling Run's obligations under the Ground Lease, including its obligation to complete construction of a parking garage prior to April 1, 2011. He testified that he has not received construction plans necessary for the issuance of permits for the project since February of 2007 when the schematic design plans were submitted.[3]

21) Benjamin F. Warner, a principal of Falling Run, also testified that Falling Run has no plans to build the Core Facility; that Falling Run will never be able to build it; and that he is unaware of how Falling Run could cure an Event of Default under the Ground Lease based on its failure to construct the Core Facility.

22) He also testified that he does not know whether Falling Run has a bank account, and that he does not know how much it would cost to construct the Core Facility.

23) Beverly Sines [Sines], Vice President and Chief Credit Officer at First United, testified confirming the loans First United made to the Warner entities, and the collateral the bank holds for these loans. Sines confirmed the Warners owe First United approximately $12 million on the cross collateralized and cross defaulted

---

[3] Although the Ground Lease is dated April 17, 2008, it replaced a prior lease between McCoy 6 and the Morgantown Building Commission dated November 1, 2004. *See* Ground Lease, at ¶ 39. The existence of this prior lease explains why Fletcher received schematics for the project prior to the effective date of the Ground Lease.

loans.

24) Sines also confirmed that First United holds security interests in thirty-three parcels of land around Falling Run, and that an appraisal conducted on the parcels placed their total value at $26 million.

25) The total appraised value of the properties and lease held as security was $20,155,000 [Exhibit 9].

26) Sines' testimony to the effect that the appraisal estimate was based on the appraiser's assumptions that the land would be developed according to the Warners' plans is mistaken.

27) Review of the appraisal assumptions [Exhibit 9 at p. 10] shows the lands appraised included the leasehold interest of Falling Run in 3.975 acres leased from the Morgantown Building Commission; that the leased land was appraised at $875,000.

28) The total amount of land appraised, including the 3.975 acres of leased property totaled approximately 32.29 acres [Exhibit 9, at p. 6-8].

29) The appraiser determined the highest and best use of the properties for appraisal purposes was: "mixed use development." [Exhibit 9, at p. 6].

30) Sines also testified regarding a color coded Tax Map depicting several parcels of land, including the parcels subject to the Ground Lease. The parties stipulated that the yellow parcels are subject to the Ground Lease, that McCoy 6 owns the blue parcels in fee simple, and that Augusta owns the orange parcels in fee simple. As a whole, the parcels depict a contiguous area on which the Warners originally planned to construct their development.

31) Sines testified further that the security interest First United holds in the Ground Lease provides its only security for Falling Run's obligations as a guarantor, and that First United will lose it if a receiver is not appointed to construct the Core Facility.

32) Sines also testified that she has not had any discussions with Johns regarding any plans to develop the Core Facility, nor with representatives from the Morgantown Building Commission. She emphasized, however, that the Bank does not want the Ground Lease to terminate.

33) Finally, the Court heard testimony from Johns. Johns testified that he is the Chapter 11 trustee in the related bankruptcies and that he is willing to serve as a receiver at Falling Run. He also testified that he believes he is qualified to serve as a receiver because he is familiar with the properties through his experience as the Chapter 11 trustee in the related bankruptcies. Johns also testified, that he has not had preliminary discussions with the City of Morgantown or Morgantown Building Commission regarding plans to construct the Core Facility. Johns also admitted that he has not developed any plans to complete this project, but that, if appointed as a receiver, he would work to cure any defaults under the Ground Lease, seek to obtain financing for the project, and work with the Morgantown Building Commission to prevent the termination of the Ground Lease. Importantly, Johns testified that he spoke with Steve Fanok, an attorney for the City of Morgantown, who indicated that the City of Morgantown intends to initiate the process to terminate the Ground Lease by sending out a written notice of default if the Core Facility is not completed by April 1, 2011.

Based on the testimony of these witnesses, the undersigned concludes that the development of the parcels depicted on the Tax Map [Ex. 8] are inextricably tied to the development of the Core Facility, and that the Court's failure to provide First United with an opportunity to preserve its interests under the Ground Lease and Deed of Trust, including the areas in the Tax Map covered by the Ground Lease, will have a collateral and deleterious impact on the remaining assets in the related bankruptcies, and the trustee's interests in those properties through cross-collateralization.

## III. CONCLUSIONS OF LAW

On the day of the hearing, Falling Run entered a special appearance and moved to dismiss the case by challenging the Court's subject matter jurisdiction. In its motion, Falling Run argued that the parties are non-diverse, and that it was not properly served and cannot be sued as a dissolved entity. Although these matters have not been fully briefed, due to the emergent nature of these proceedings, the Undersigned concludes that the Court's jurisdiction is proper and recommends that Falling Run's motion to dismiss be denied, subject to renewal at a later date. The Undersigned recommends further that First United's Emergency Motion for Appointment of a Receiver [DE 6] be granted.

**A.      Falling Run's Motion to Dismiss**

**1.      Subject Matter Jurisdiction**

Falling Run argues that the Court lacks subject matter jurisdiction over this diversity action. Falling Run does not dispute that the amount in controversy exceeds $75,000.00, but asserts that the parties are non-diverse. More specifically, it argues that First United has its principal place of business is in West Virginia because it has branches in Mineral, Hardy, Monongalia, and Berkeley counties.

9

Pursuant to 28 U.S.C. § 1332(c)(1), "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." "To determine where a corporation has its principal place of business," the Fourth Circuit has "recognized two tests, the 'nerve center test' and the 'place of operations test.'" *Athena Automotive, Inc. v. DiGregorio*, 166 F.3d 288, 290 (4th Cir. 1999) (citing *Peterson v. Cooley*, 142 F.3d 181, 184 (4th Cir.1998)). In circumstances when an entity "engages primarily in the ownership and management of geographically diverse investment assets," the Court must apply the "'nerve center' test, which establishes the corporation's principal place of business as that place where the corporation 'makes the home office, or place where the corporation's officers direct, control, and coordinate its activities.'" *Id.* (internal quotation marks omitted). In circumstances where an entity "has 'multiple centers of manufacturing, purchasing, or sales,'" the Court must focus on " 'the place where the bulk of corporate activity takes place.'" *Id.*

Here, First United, a bank, does not manufacture, sell, or purchase products. Therefore, the "nerve center" test applies for the purpose of determining its principal place of business. *Eugenia VI Venture Holdings, Ltd. v. Surinder Chabra*, 419 F. Supp.2d 502, 506 (S.D.N.Y. 2005). Aside from asserting that First United has several branches in West Virginia, Falling Run does not contend that First United has its home office in West Virginia, or that "its officers direct, control or coordinate its activities" there. *Athena Automotive*, 166 F.3d at 290. Thus, the presence of First United's branches in West Virginia, alone, is insufficient to establish that its principal place of business is in West Virginia. Accordingly, the Undersigned concludes that Falling Run's bare contentions are insufficient to establish that the parties are non-diverse for the purposes of 28 U.S.C. § 1332.

10

## 2. Service of Process and Claims Against Dissolved Limited Liability Companies

Under West Virginia law, a dissolved corporation "'may be served upon the same person who might have been served before dissolution.'" State ex rel. U.S. Fidelity & Guar. Co. v. Stone, 509 S.E.2d 598, 601 n.1 (W. Va. 1998) (quoting Lynchburg Colliery Co. v. Gauley & Eastern Railway Co., 114 S.E. 462, 464 (1922)). Pursuant to Federal Rules of Civil Procedure, a domestic corporation must be served

> in a judicial district of the United States:
>
> (A)  in the manner prescribed by Rule 4(e)(1) for serving an individual; or
>
> (B)  by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and--if the agent is one authorized by statute and the statute so requires--by also mailing a copy of each to the defendant[.]

Fed. R. Civ. P. 4(h). Pursuant to Rule 4(e)(1), a domestic corporation "may be served in a judicial district of the United States by . . . following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e). Under West Virginia law, service upon a domestic private corporation may be made by serving "a copy of the summons and complaint to an officer, director, or trustee," including the corporation's "agent or attorney-in-fact authorized by appointment or statute to receive or accept service of the summons and complaint in the individual's behalf." W. Va. R. Civ. P. 4(d)(1), (6). West Virginia law provides further that the "Secretary of State is an agent of the [limited liability] company upon whom process, notice or demand may be served" if the limited

liability company otherwise fails "to appoint or maintain an agent for service of process[.]" W. Va. Code, § 31B-1-111.

Here, Falling Run does not dispute that the Secretary of State would be its agent for service of process during the time it maintained its corporate existence, but contends that the Secretary of State can no longer accept service on its behalf because it has dissolved. Falling Run contends further that its status as a dissolved limited liability company protects it from being sued.

Falling Run is incorrect. The West Virginia Code, for example, provides that any claims against a dissolved limited liability company will be barred unless the claim is filed within five years of receiving notice of the company's dissolution, in accordance with the notice requirements of W. Va. Code § 31B-8-808(b) and (c). If a limited company fails to comply with these notice requirements ,the statute provides that

> (d)    A claim not barred under this section may be enforced:
>
> > (1)    Against the dissolved limited liability company, to the extent of its undistributed assets; or
> >
> > (2)    If the assets have been distributed in liquidation, against a member of the dissolved company to the extent of the member's proportionate share of the claim or the company's assets distributed to the member in liquidation, whichever is less, but a member's total liability for all claims under this section may not exceed the total amount of assets distributed to the member.

W. Va. Code § 31B-8-808.

Here, Falling Run became a defunct limited liability company in November of 2009. Therefore, even if Falling Run complied with the notice requirements of W. Va. Code § 31B-8-808, First United filed its complaint within the applicable five year limitation term. Moreover, the lawsuit

concerns the undistributed assets of First United, namely, its interests in the Ground Lease. Accordingly, Falling Run may be sued under West Virginia law.

Contrary to Falling Run's assertion, its status as a defunct entity does not prevent it from being served through the West Virginia Secretary of State. *See Stone*, 509 S.E.2d at 601 n.1. Thus, because the West Virginia Secretary of State was Falling Run's agent for receiving service of process during its existence, it was proper for First United to serve Falling Run in that manner after its termination. Falling Run's challenge to the Court's subject matter jurisdiction on this basis, therefore, fails as a matter of law.

### 3.    Rule 19. Necessary and Indispensable Parties

Falling Run contends, in passing, that the City of Morgantown is a "necessary and indispensable party" pursuant to Federal Rule of Civil Procedure 19 since it is the owner of the real property covered by the Ground Lease. Federal Rule of Civil Procedure 19 sets forth a two-part inquiry in which a court must first determine whether a party is necessary to the action, and if the joinder would destroy jurisdiction. *Cytec Industries, Inc. v. Powell*, 630 F. Supp.2d 680, 685 (N.D.W.Va. 2009) (Keeley, J.) (citing *Teamsters Local Union No. 171 v. Keal Driveaway Co.*, 173 F.3d 915, 917-18 (4th Cir. 1999)). If so, the Court must then determine whether the action should proceed among the existing parties or be dismissed. *Id.* "A party is 'necessary' to an action if (1) in that person's absence, complete relief cannot be afforded among the existing parties; or (2) 'that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence [would] leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.'" *Id.* (quoting Fed. R. Civ. P. 19(a)(1)).

First, because First United is a corporate citizen of the State of Maryland, the joinder of the City of Morgantown or Morgantown Building Commission as defendants would not destroy diversity. Second, under the present record, neither the City of Morgantown nor the Morgantown Building Commission are necessary parties because First United seeks only to recover a debt owed to it by Falling Run, and to preserve the security Falling Run provided for that debt. Although the appointment of a receiver may enable First United to preserve the Ground Lease, such an appointment would not diminish or interfere with the City of Morgantown/Morgantown Building Commission's ownership of the Leased Premises in fee simple, or its substantive rights, to any greater extent than if the principals of Falling Run remained in place. In other words, the appointment of a receiver would only place the management of Falling Run in different hands– it would not substantively impair any legal rights or remedies of the Morgantown Building Commission or the City of Morgantown. The City of Morgantown and Morgantown Building Commission would retain all of the rights they would have should the Court appoint a receiver be made. Accordingly, the Court may afford complete relief among the existing parties, and the failure to join the City of Morgantown or the Morgantown Building Commission will not expose either to a "'substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.'" *Id.* For these same reasons, the City of Morgantown and Morgantown Building Commission are not "indispensable" parties under Federal Rule of Civil Procedure 19(b).

**B.      Legal Standards for Appointing a Receiver**

As noted earlier, paragraph 6(a)(ii) of the Deed of Trust provides that First United may seek to have a receiver appointed to "take charge of" the Leased Premises under the Ground Lease if an Event of Default occurs under the Deed of Trust. Deed of Trust at ¶ 6(a)(ii) (DE 3-4). Under the

Deed of Trust, Events of Default include the impairment of the security for the secured debt, and failing to comply with the requirements of the Loan Agreement. *Id.* at ¶ 5(c), (h). Because Falling Run has failed to comply with its obligations as a guarantor under the Loan Agreement, and has impaired the security of the Leased Premises by failing to initiate efforts to construct the Core Facility as required by the Ground Lease, First United contends that it has entitlement to the appointment of a receiver as a matter of contractual right. *See Am. Bank & Trust Co. v. Bond Int'l Ltd.*, No. 06:CV317-CVE-FMH, 2006 U.S. Dist. LEXIS 58361 (N.D. Okla. Aug. 17, 2006) (unpublished) (holding that, "in the absence of a contractual agreement for a receiver, a federal court possessing subject matter jurisdiction over an action has the authority to appoint a receiver under appropriate circumstances."); *cf. Hutchinson v. Fidelity Inv. Ass'n*, 106 F.2d 431, 436 (4th Cir. 1939) (citing *Pennsylvania v. Williams*, 294 U.S. 176, 182 (1935)) ("It should not be forgotten that the appointment of a receiver is not a matter of right, but one resting in the sound discretion of the court."). Impliedly, *Am Bank & Trust Co.* stands for the proposition that when the parties have entered into a clear contractual agreement for the appointment of a receiver, the Court may consider such a provision.

The Court could not locate additional authority for First United's position that it has a contractual right to the appointment of a receiver as a matter of right. Under either a clear contractual right or the equitable principles district courts typically consider at common law when determining whether to appoint a receiver, however, the Undersigned concludes that the appointment of a receiver is warranted.

A district court's authority to appoint a receiver derives from its inherent equitable powers under the common law. *See Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir.

15

2006) (citing Fed. R. Civ. P. 66). "[F]ederal law governs the issue of whether to appoint a receiver in a diversity action." *Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 843 (9th Cir. 2009). "The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." *Capwill*, 462 F.3d at 551 (citing 13 Moore's Federal Practice ¶¶ 66.02-03 (3d ed. 1999)). "As an officer of the court, the receiver's powers are coextensive with his order of appointment." *Id.*

In determining whether to appoint a receiver, "federal courts typically consider, *inter alia*, the following factors:

    i)        inadequacy of the security to satisfy the debt;

    ii)       financial position of the debtor;

    iii)     fraudulent conduct on defendant's part;

    iv)     inadequacy of legal remedies;

    v)      imminent danger of the property being lost, concealed, injured, diminished in value, or squandered;

    vi)     probability that harm to moving party by denial of appointment would outweigh injury to parties opposing appointment;

    vii)    probability of moving party's success in the action and the possibility of irreparable injury to its interest in the property; and

    viii)   whether moving party's interests sought to be protected will in fact be well-served by receivership.

*Brill & Harrington Investments v. Vernon Savings and Loan Association*, 787 F. Supp. 250, 253-54

(D.D.C. 1992) (citing *New York Life Ins. Co. v. Watt West Invest. Corp.*, 755 F. Supp. 287, 292 (E.D. Cal. 1991)). "[T]he primary consideration in determining whether to appoint a receiver is the necessity to protect, conserve and administer property pending final disposition of a suit." *Waag v. Hamm*, 10 F. Supp.2d 1191, (D. Colo. 1998) (citing *Consolidated Rail Corp. v. Fore River Ry. Co.*, 861 F.2d 332, 326-27 (1st Cir. 1988)).

At the close of the hearing, First United argued that the Court should appoint a receiver because Falling Run lacks any financial means to comply with its obligations under the Ground Lease, that Falling Run has made no efforts to construct the Core Facility, that the Ground Lease could terminate within twenty days of April 1, 2011, if nothing is done, that Falling Run will not suffer any prejudice from the appointment of a receiver, and that the appointment of a receiver is critical for it to protect its security in the Ground Lease. Falling Run, in contrast, argued that First United is not entitled to relief because the case does not present an emergency, that First United has failed to show irreparable harm, that a receiver will not be able to secure financing or save the Ground Lease from termination, that First United could negotiate with the Morgantown Building Commission to save the Ground Lease without a receiver, and that the status quo will remain the same whether the Court appoints a receiver or not. In rebuttal, First United emphasized that Falling Run did not assert that it would suffer any harm if the Court appoints a receiver. Based on the evidence presented, and the arguments of counsel, the Undersigned will address each of the factors district courts traditionally consider when determining whether to appoint a receiver. *See* Fed. R. Civ. P. 66.

### 1.     Inadequacy of the Security to Satisfy the Debt

This factor weighs in favor of appointing a receiver. Falling Run's interest in the Ground

Lease provides its only security for its obligations as a guarantor. Falling Run will not, and cannot, construct the Core Facility prior to April 1, 2011. Moreover, if Falling Run fails to meet this milestone, Johns testified that the Morgantown Building Commission has plans to initiate the process to terminate the Ground Lease on that date. Should this occur, unless the Court appoints a receiver, there can be no doubt that First United will be at risk of losing its security interest in the Ground Lease.

As discussed earlier, Falling Run owes First United approximately $1.1 million as a guarantor of advances it made under the Loan Agreement's commercial line of credit. Moreover, based on the cross-collateralization of prior loans, the Warner entities owe First United a total of approximately $12 million. While the appraisal placed the total value of the security for these loans at $20,155,000 [Exhibit 9], and valued the 3.975 acre leasehold interest of Falling Run at $875,000, the value of Falling Run's interest in the Ground Lease will be reduced to zero if the Morgantown Building Commission terminates it. Moreover, the parcels subject to the Ground Lease are integral to the value of the adjacent properties currently being administered in the related bankruptcies, and the loss of the Ground Lease will undoubtedly harm the creditors in those bankruptcies. In any event, without affording First United an opportunity to preserve the Ground Lease, it will lose the only security it has for Falling Run's obligations as a guarantor.

### 2.    Financial Position of the Debtor

This factor weighs in favor of appointing a receiver. Falling Run, a defunct company, receives no income[4] and has a debt of at least $1.1 million. The only asset it has is its interest in the

---

[4] Benjamin F. Warner also testified he operated a gravel parking lot on the site dedicated for construction of the Core Facility pocketing $200-300 per day in revenues, of which he and one of his brothers use primarily for personal living expenses. None of these proceeds have been paid

Ground Lease. In point of fact, during his closing argument, counsel for Falling Run candidly characterized Falling Run as a "shell company." Moreover, Benjamin F. Warner, a principal of Falling Run, testified that he is unaware whether the company has a bank account, and that it has no means to construct the Core Facility.

### 3. Fraudulent Conduct on Defendant's Part

This factor weighs neutrally. Although First United argued that Falling Run's failure to pay its debts is suggestive of fraudulent activity, fraud is not an issue in this case and no evidence of actual or constructive fraud was presented.

### 4. Inadequacy of Legal Remedies

This factor weighs in favor of appointing a receiver. As discussed earlier, Falling Run's only asset is its interest in the Ground Lease. Without the appointment of a receiver, First United will have little chance of saving its security interest in it. Falling Run is virtually judgment proof. Therefore, a judgment against Falling Run is uncollectible and Falling Run could not compensate First United for the loss of its security interest in the Ground Lease.

### 5. Imminent Danger of the Property Being Lost, Injured, Diminished in Value, or Squandered

This factor weighs in favor of appointing a receiver. Falling Run's failure to construct the Ground Lease by April 1, 2011, will not cause the Ground Lease to terminate on that date. Under the Ground Lease, when an Event of Default occurs, the City of Morgantown must send Falling Run as lessee, and First United, as a Leasehold Mortgagee, written notice of the Event of Default. *See* Ground Lease at ¶¶ 23, 38. Upon receiving such notice, Falling Run and First United would have

---

toward Falling Run's debt to First United.

a twenty day period to either cure the Event of Default, or initiate diligent efforts to do so. *Id.* Accordingly, the Morgantown Building Commission could not send out such a written notice of default based on Falling Run's failure to construct the Core Facility until April 1, 2011, at the earliest.

Despite the notice and cure provisions of the Ground Lease, Falling Run's failure to initiate any steps toward constructing the Core Facility, nearly three years after the effective date of the Ground Lease, present circumstances that are sufficiently emergent to warrant the appointment of a receiver. As Sines and Johns testified, neither have any concrete plans to construct or finance the Core Facility, nor have they discussed this possibility with the Morgantown Building Commission. As of April 1, 2011, a receiver will have a minimum of twenty days to initiate efforts to construct the Core Facility. Because twenty days provides such a small window to begin such a project, a receiver will need to be appointed as soon as possible to afford him with an opportunity to initiate steps to construct the Core Facility. Although the appointment of a receiver will not guarantee that First United's security interest in the Ground Lease will be preserved, such an appointment will give it a chance to do so.

### 6. Probability that Harm to Moving Party by Denial of Appointment Would Outweigh Injury to Parties Opposing Appointment.

This factor weighs in favor of appointing a receiver. During closing argument, counsel for Falling Run did not assert that it would suffer any harm from the appointment of a receiver. As noted earlier, aside from its interest in the Ground Lease, the company lacks additional assets, and has no means to comply with its obligations under the Ground Lease. Accordingly, appointing a receiver to preserve Falling Run's only asset would not harm its interests. Moreover, if the Court fails to appoint a receiver, First United will face a significant risk of losing its only collateral for

Falling Run's obligations as a guarantor. It is not certain that the Morgantown Building Commission will initiate the process to terminate the Ground Lease after April 1, 2011. Notwithstanding this fact, when comparing the risk of harm First United faces from Falling Run's failure to construct the Core Facility, with the fact that Falling Run will not suffer any cognizable harm from the appointment of a receiver, this factor weighs in favor of making such an appointment.

7.     **Probability of Moving Party's Success in the Action and the Possibility of Irreparable Injury to its Interest in the Property**

This factor weighs in favor of appointing a receiver. First United's complaint includes a count for breach of Falling Run's contractual obligations under the Loan Agreement, Note, Deed of Trust, and for its default under the Ground Lease, and payment under the Note for the amounts owned, a count seeking the appointment of a receiver, and a count for attorneys' fees under the Commercial Guaranty. Based on the fact that Falling Run admits it has not paid toward its obligations as a guarantor under the Loan Agreement, and based on Benjamin F. Warner's testimony that Falling Run has no means or intent to construct the Core Facility, First United has a high probability of successfully prevailing on the underlying merits of this action. Moreover, the failure to appoint a receiver will present a high portability that First United will lose its only security for Falling Run's obligations as a guarantor.

8.     **Whether Moving Party's Interests Sought to be Protected Will in Fact be Well-Served by Receivership**

This factor weighs slightly in favor of appointing a receiver. As First United acknowledges, under paragraph 23(n) of the Ground Lease, the appointment of a receiver for Falling Run constitutes an "Event of Default" in and of itself. Accordingly, if the Court appoints a receiver, such an appointment could provide the Morgantown Building Commission with an independent basis for

initiating the process to terminate the Ground Lease. When questioned about this provision during the hearing, Johns testified that he would work with the Morgantown Building Commission to prevent the Ground Lease from being terminated on this basis. Johns testified further that he would work diligently to cure any defaults under the Ground Lease, and work to obtain financing for the construction of the Core Facility.

Thus, although the appointment of a receiver will create an independent Event of Default under the Ground Lease, without such an appointment, the Core Facility will not be built, and the Morgantown Building Commission's termination of the Ground Lease is a foregone conclusion. A receiver, however, can make efforts to cure Falling Run's defaults, and work with the Morgantown Building Commission to prevent the termination of the Ground Lease. Admittedly, the appointment of a receiver is an imperfect solution to the dilemma faced by First United, but it provides the best and only opportunity for First United to protect its security interest in the Ground Lease.

Overall, seven out of eight factors weigh in favor of appointing a receiver, and one factor weighs neutrally. Moreover, given that Falling Run has committed an Event of Default under the Deed of Trust by impairing the security of the Ground Lease, it is clear that Falling Run contractually consented to such an appointment. Because the appointment of a receiver will serve to preserve Falling Run's only asset and will provide First United with its only chance for preserving its security interest in the Ground Lese, the appointment of a receiver is warranted.

The Undersigned finds that Johns is an appropriate candidate to serve as a receiver. Johns already serves as a trustee for the related bankruptcies, and administers properties adjacent to the parcels covered by the Ground Lease. Furthermore, Johns' service as a Chapter 11 trustee does not present a conflict of interest. As discussed earlier, the parcels covered by the Ground Lease are

integral to the value of the properties and businesses held by the Warner entities pending in the related bankruptcies. Johns, therefore, has no incentive to sabotage the Ground Lease based on his responsibilities as a trustee. To the contrary, his responsibilities as a trustee and as a receiver will complement one another and provide him with additional opportunities to presrve the Ground Lease and improve the positions of the creditors in the related bankruptcies. Moreover, Johns has fourteen years of experience working with bankruptcy matters and serves as a trustee in both the Northern and Southern Districts of West Virginia. His professional experience and familiarity with the background of this case, therefore, uniquely qualify him to serve as a receiver in this case.

## C.    Application of West Virginia Code Chapter 53, Article 6, Section 1

The general rule is that appointments of receivers are not made ex parte and without notice. The Undersigned recognized this principle when the order scheduling the March 28, 2011, hearing was entered. That order required: "Counsel for Plaintiff shall, at Plaintiff's risk, determine what entities may be entitled to  notice of the hearing and shall provide the same to each." The appointment of a receiver without notice to an interested party is a remedy that is "not to be granted loosely, but is to be watched with jealous eyes." *Shapiro v. Wilgus,* 287 U. S. 348, 356 (1932). As previously noted, federal courts have jurisdiction and discretionary power to make appointments of receivers upon proper showing of actual emergencies. *Tennessee Pub. Co. v.* Carpenter, 100 F.2d 728, 732 (6th Cir. 1938).

"[A]lthough a state statute may provide a vehicle for the appointment of a receiver, such a statute does not change the nature of the federal courts' equitable powers." *LaPeter*, 563 F.3d at 843. "[R]egardless of whether state law provides a vehicle by which to appoint a receiver, the federal courts are free to provide that remedy solely by virtue of their equitable powers." *Id.; see*

*also Clough marketing Services, Inc. v. Main Line Corporation*, No. 1:07CV173-RLV, 2007 WL

496739 (N.D. Ga. 2007) (citing *Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289,

1292 (11th Cir. 1998)).

West Virginia Code Chapter 53, Article 6, Section 1 provides for the general appointment

of a receiver. It provides in pertinent part that

> A court of equity may, in any proper case pending therein, in which
> funds or property of a corporation, firm or person is involved, and
> there is danger of the loss or misappropriation of the same or a
> material part thereof, appoint a special receiver of such funds or
> property, or the rents, issues and profits thereof, or both, who shall
> give bond with good security to be approved by the court, or by the
> clerk thereof, for the faithful performance of his trust, and for paying
> over and accounting for, according to law, all such moneys that may
> come into his hands by virtue of his appointment. But no such
> receiver shall be appointed of any real estate, or of the rents, issues
> and profits thereof, until reasonable notice of the application therefor
> has been given to the owner or tenant thereof. ...

Notwithstanding the Undersigned's order scheduling the hearing, First United did not give

notice to the City of Morgantown or its Building Commission. Neither the City nor the Building

Commission made an appearance at the hearing. It is undisputed that the City of Morgantown,

through the Morgantown Building Commission, is the record title owner of the property comprising

the lands dedicated to the construction of the Core Facility. It is undisputed that notice was given

to the lessee, Falling Run, and Falling Run appeared and participated in the hearing.

The undersigned concludes that, even if West Virginia Code Chapter 53, Article 6, Section

1 was dispositive with respect to the Court's power and jurisdiction to appoint a receiver, which it

is not, the notice requirement of the statute was met when First United served notice on Falling Run,

thus using the disjunctive "or" of the statute to its advantage. In order to satisfy any remaining due

process issues, however, the undersigned **ORDERS** First United to serve the City of Morgantown and the Morgantown Building Commission with a copy of this Report and Recommendation in accord with the provisions of Federal Rule of Civil Procedure 4, within five days of the entry of this Report and Recommendation.

## IV. RECOMMENDATION

For all the above reasons, it is **RECOMMENDED** that Falling Run's motion to dismiss [DE 13] be **DENIED**, that First United's emergency motion for appointment of a receiver [DE 6] be **GRANTED**, and that Robert L. Johns be appointed to serve as a receiver for Falling Run's rights and interests under the Ground Lease. The Undersigned further recommends that Robert L. Johns receive the powers and authority set forth below :

1.      Effective at _____ (the "Effective Date"), Robert L. Johns hereby is appointed as Receiver (the "Receiver") for that leasehold property (the "Leasehold Property" described in that *Credit Leasehold Deed of Trust* dated December 19, 2008 and recorded among the Land Records of Monongalia County at Volume 1669 Page 870 (the "*Deed of* Trust") from The Square at Falling Run, LLC (hereinafter "Falling Run") unto that Trustee therein named for the benefit of First United Bank & Trust ("First United").

2.      By virtue of this *Order,* First United is not a mortgagee in possession.

3.      The Receiver shall have no obligation to administer any existing pension, profit sharing, 401(k), health, insurance or other employee benefit plans of Falling Run.

4.      The Receiver shall post a $5,000.00 bond[5] with sufficient surety.

5.      The Receiver is appointed hereunder for the benefit and protection of the rights and

_____

[5] Falling Run's principal, Benjamin F. Warner, is collecting parking rents on a gravel parking lot. The undisputed amount of rents are between $200.00 and $300.00 per day. At best, Falling Run could continue to operate the parking lot for 20 days after receiving notice of a default from the Morgantown Building Commission. Moreover, First United is entitled under the security instruments to the rents and profits from the parking lot property. A $5,000.00 bond is more than adequate to cover any loss Falling Run or its principals may legitimately sustain if it were determined that a receiver was improvidently appointed.

interests as provided under the *Deed of Trust* and under all of those other documents executed and delivered in connection with the financial transaction secured thereby (all of which said documents, including the *Deed of Trust*, being hereinafter collectively referred to as the "Loan Documents").

6.      The Receiver will be compensated from the receivership estate his reasonable fees and expenses for services provided by the Receiver and those employed by him. The Receiver and those employed by him will furnish to the Court copies of the invoices for services rendered and costs incurred on a monthly basis.

7.      The Receiver shall have and is granted all necessary powers to protect and preserve the rights and interests of First United Bank & Trust in and to the Leasehold Property, including, without limitation, the following powers and responsibilities:

(a)     to take possession, custody and control of the Leasehold Property and all personalty related thereto;

(b)     to operate, manage and maintain the Leasehold Property as may be in the best interests of the receivership estate, including but not limited to the Leasehold Property, and in accordance with the Receiver's fiduciary duty;

(c)     to direct Falling Run, its equity owners, officers, agents, employees or other representatives immediately to turn over and deliver or cause to be delivered to the Receiver or his designee all personalty which relates in any manner to the management or operation of the Leasehold Property;

(d)     to solicit and contract with investors, lenders, developers and other necessary parties to effectuate a cure of Falling Run's defaults (current and prospective; collectively, the "Defaults") under the *Ground Lease*, as amended, between it and the City of Morgantown Building Commission;

(e)     to pay, settle or compromise existing bills and claims which are or may be liens against the Leasehold Property, or as may be necessary or desirable in connection with a cure of the Defaults;

(f)     to execute any and all applications, contracts, permits and certificates which may be required in connection with any contract relating to the Leasehold Property or which may be required to cure the Defaults;

(g)     to obtain and pay any reasonable fees for any lawful license, permit or other governmental approval relating to the Leasehold Property or the operation and maintenance thereof;

(h)     to confirm the existence of any application, permit or license and, to the extent permitted by law, exercise the privileges or the operation thereof, and do all things necessary to protect and maintain such applications, licenses, permits and approvals;

(i)     to demand, collect and receive all rents and revenues derived from the Leasehold Property, or any part thereof;

(j)     to incur such expenses and make such disbursements as may, in the Receiver's judgment, be advisable or necessary in connection with the operation, care, management, preservation and maintenance of the Leasehold Property;

(k)     to commence and prosecute all such actions at law or in equity that the Receiver deems necessary to fulfill his duties to liquidate or preserve the Leasehold Property including, without limitation, to bring and prosecute all actions for: (i) collection of rents and revenue derived from the Leasehold Property; (ii) removal from the Leasehold Property of persons not entitled to entry thereon; (iii) protection of the Leasehold Property; and, (iv) damage caused to the Leasehold Property;

(l)     to hire, employ, and retain attorneys, certified public accountants, investigators, developers, engineers, surveyors, security guards, consultants, management companies, brokers, contractors, and any other personnel or employees whom the Receiver deems necessary to preserve and maintain the Leasehold Property and to otherwise protect the receivership estate's interest in and to the Leasehold Property;

(m)     to confirm that the Leasehold Property is adequately insured and in proper repair, to promptly report any evidence or findings to the contrary to the parties and to the Court and, if necessary, to disburse funds for the maintenance of fire, hazard and liability insurance for the Leasehold Property;

(n)     to terminate, abrogate, modify, or continue in effect any or all agreements, contracts, understandings or commitments entered into by Falling Run with respect to the Leasehold Property, to the extent permitted by applicable law;

(o)     to open new accounts with, or negotiate, compromise or otherwise resolve Falling Run's existing obligations to utility companies or other service providers or suppliers of goods and services as are necessary to maintain, manage, operate, preserve and protect the Leasehold Property;

(p)     to make any repairs to the Leasehold Property that the Receiver, in his discretion deems necessary and appropriate;

(q)     subject to approval of the Court, to borrow funds from First United Bank & Trust and/or any other lending institution that may be willing to advance funds which the

Receiver deems necessary for the preservation and maintenance of the Leasehold Property;

(r)   to remove from the Leasehold Property any and all persons and property which would prevent the Receiver from taking those actions to begin effecting a cure of Falling Run's defaults under the Ground Lease;

(s)   to open and utilize new bank accounts with respect to the Receiver's management of the Leasehold Property;

(t)   to manage, operate and control Falling Run as the Receiver may deem necessary and appropriate to protect the receivership estate's interests, including but not limited to the interests of First United, as the beneficiary under the Credit Line Leasehold Deed of Trust, in and to the Leasehold Property specifically including, but not limited to the right to commence a case under Chapters 7 or 11 of Title 11 of the United States Code;

(u)   to take any and all actions, not specifically enumerated herein, which are necessary and proper under West Virginia Law to adequately manage, control, operate, maintain, and protect the Leasehold Property and to apply to this Court for further direction and for such further power as may be necessary to enable the Receiver to fulfill his duties;

8.   All such monies advanced by First United shall be deemed secured by and under the Loan Documents and this Order, by which the Lender is and will continue to be secured in the Leasehold Property and any and all other property referenced in the Credit Line Leasehold Deed of Trust. In order to exercise the authority conferred upon him under this Paragraph and more generally by this Order, the Receiver is hereby vested with the standing and all power and authority of, but without the liability of or associated with or obligation to act as: (1) manager, member, board of managers, and/or officer of Falling Run; and (2) Falling Run in its capacity and relationship as an "employer", as the Receiver deems necessary. Said standing, power and authority shall, include, without limitation, the power and authority to: (i) assert or waive attorney/client, work product, joint defense or other privilege; (ii) execute documents, instruments and resolutions in connection with any sale or finance transaction; (iii) have and obtain access to employee records, reports, communications and other work product, and (iv) commence a case under Chapters 7 or 11 of Title 11 of the United States Code. The Receiver may apply to this Court for further direction and for such further powers as may be necessary to enable the Receiver to fulfill his duties.

9.   To the extent that Falling Run has not already done so, the Receiver is authorized to terminate, in compliance with any and all state and federal laws, any or all of Falling Run's employees and the Receiver, as well as those individuals acting for and at the direction of the Receiver, shall have no personal liability arising from any such termination.

10. The Receiver or his designees shall conduct an inspection of the Leasehold Property and shall perform a complete inventory of the same pursuant to this Order. Such inspection and inventory shall be conducted with appropriate advance notice to First United as well as Falling Run and its agents, employees or other representatives, and the Receiver or his designee shall file with the Clerk's Office a true and complete inventory of the property within forty-five (45) days after the date of this Order. The Receiver or his designee shall keep a true and accurate account of any and all receipts and expenditures and shall, so often as the Court directs, file with the Court an Inventory and Account under oath, of any additional property or effects which he has discovered which shall have come into his hands since his appointment, and of the amount remaining in his hands or invested by him, and of the manner in which the same is secured or invested, stating the balance due from or to him at the time.

11. Within 10 calendar days of appointment, the Receiver shall file a written report with the Court advising the Court of all steps the receiver has taken to comply with the ground lease's requirement that the lessee construct the core facility before April 1, 2011 or any extension of said time under the terms of the ground lease. Thereafter and not later than 30 days after the last written report, the Receiver shall file periodic written reports with the Court advising the Court of all steps the receiver has taken to comply with the ground lease's requirement that the lessee construct the core facility before April 1, 2011 or any extension of said time under the terms of the ground lease.

12. The Receiver may, if he so chooses, permit existing insurance coverage for the Leasehold Property to remain in force until the expiration of the current paid up term under such policy or policies and shall notify the insurance carriers immediately of the appointment of the Receiver hereby and request that the Receiver be added to the insurance policy or policies as an additional insured thereunder. Upon the expiration of the paid up portion or such policy or policies, the Receiver shall have the responsibility for keeping the Leasehold Property insured and may, as an option, keep in force the existing insurance coverages or obtain new coverages for the Leasehold Property, each of which coverages shall name the Receiver as an Additional Insured thereunder.

13. Falling Run and its managers, board of managers, officers, equity owners, agents, employees or other representatives are hereby enjoined from interfering in any manner with the Receiver in his management, control and operation of the Leasehold Property as herein defined.

14. The Receiver shall not be bound by all or any contracts, agreements, understandings or other commitments Falling Run had, or may have had with third parties, whether oral or written. The Receiver may, by an affirmative written ratification executed by the Receiver, agree to become bound by any such contracts, agreements, understandings or other commitments, or may agree to enter into any new or amended contracts, agreements, understandings or other commitments. Nothing in this Order constitutes or shall be construed to constitute an assumption of any of the leases, contracts, or agreements currently existing with respect to the Leasehold Property by the Receiver or a waiver by the Receiver of any default under any such lease, contract or agreement.

15.     The Receiver, in his discretion, is authorized to notify all necessary local, state, and federal government agencies, and all vendors and suppliers, and any and all others who provide goods or services to the Leasehold Property, of his appointment as Receiver.

16.     The Receiver shall be authorized to pay and discharge out the funds coming into his hands all the expenses of the receivership and the costs and expenses of operation and maintenance of the Leasehold Property, including all taxes, governmental assessments and charges and the nature thereof lawfully imposed upon the Leasehold Property.

17.     After expending the necessary funds to operate, manage and maintain the Leasehold Property and paying all reasonable and necessary costs and expenses associated with such operation, the Receiver shall, subject to the prior approval of the Court, pay to First United the remaining funds, which shall then be applied by the Plaintiff in accordance with the terms of the Loan Documents or otherwise required by law.

18.     The Receiver is authorized generally to do such other things as may be necessary or incidental to the foregoing specific powers, directions and general authorities and take actions relating to the Leasehold Property.

19.     The Receiver may obtain liability insurance to protect himself in carrying out his duties hereunder with a policy limit of not more than $1,000,000 and the premium therefor should be paid from the Rents and other revenue generated from the Leasehold Property.

20.     The Receiver shall have no duty or obligation to prepare and/or file any tax returns or pay any taxes of Falling Run that presently have accrued and/or are or may become due in respect of any period prior to the Effective Date, with the exception of payroll, employment and similar taxes or withholdings for those of Falling Run's employees who are retained by the Receiver after the Effective Date.

21.     The Receiver is authorized to obtain from Falling Run and any of its members, managers, equity owners, officers, agents and employees, who are hereby ordered to deliver to the Receiver, any and all rents and other revenue and receipts relating to the Leasehold Property, held by Falling Run or any of its agents.

22.     The Receiver shall not be obligated to contribute his personal funds in the performance of his duties hereunder. The Receivership ordered hereby is to be conducted solely from the funds arising from the Leasehold Property or additional advances. No obligation incurred by the Receiver in his fiduciary capacity shall be the personal obligation of the Receiver, individually.

23.     The Receiver, his employees and counsel, are entitled to rely on all outstanding rules of law and Court Orders and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver be liable to anyone for good faith compliance with his duties and responsibilities, nor shall the Receiver, his employees or advisors be liable to anyone for any actions taken or omitted by them except upon a finding by this

Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence or reckless disregard of their duties.

24.    The Receiver shall have no personal liability to any party or governmental agency whatsoever for any environmental liabilities arising out of, or relating to, the Leasehold Property or any actions taken by the Receiver with respect to the administration of the Leasehold Property.

25.    First United may seek Court termination of the receivership authorized and created hereby at any time by its filing with the Court and service upon the Receiver and Falling Run of a *Notice to Terminate Appointment of Receiver*. The Receiver may terminate the receivership authorized and created hereby upon the entry of an Order of this Court after a motion by the Receiver is filed, with no less than ten (10) days' notice to First United. Upon proper notice thereof and upon hearing and determination of this Court that the purposes of this receivership have been served, this Court may terminate the receivership upon such Motion of the Receiver.

26.    The appointment of a receiver and the receivership created by such order of appointment shall continue until the further order of the Court.

**IT IS HEREBY FURTHER ORDERED** that the Defendant, and all other persons with actual or constructive knowledge of this Order and their agents and employees, except Plaintiff, shall:

a.    turn over to the Receiver the possession of the rents and custody and control of the Leasehold Property, including all keys to all locks on the Leasehold Property, and the records, books of account, ledgers and all business records for the Leasehold Property, wherever located in and whatever mode maintained (including, without limitation, information contained on computers and any and all software relating thereto as well as all banking records, statements and canceled checks);

b.    turn over to the Receiver all documents which constitute or pertain to all licenses, permits or governmental approvals relating to the Leasehold Property;

c.    turn over to the Receiver all documents which constitute or pertain to insurance polices, whether currently in effect or lapsed which relate to the Leasehold Property;

d.    turn over to the Receiver all contracts, leases and subleases, royalty agreements, licenses, assignments or other agreements of any kind whatsoever, whether currently in effect or lapsed, which relate to any interest in the Leasehold Property;

e.    turn over to the Receiver all rents and revenues derived from the Leasehold Property (including, without limitation, all security deposits, advances, prepaid rents, storage fees, and parking fees) wherever and whatsoever mode maintained; and

f.   nothing herein is intended to, nor is to be construed to, render the Plaintiff a mortgagee in possession of the Leasehold Property.

**IT IS HEREBY FURTHER ORDERED** that the Receiver or First United Bank & Trust may at any time apply to this Court for any further or other instructions and powers necessary to enable the Receiver to perform his duties properly.

**SO ORDERED** this _____ day of _____, 2011.

Any party and the City of Morgantown and/or the Morgantown Building Commission may, within six (6) days of the entry of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of Court is directed to send copies of this Report and Recommendation to all counsel of record.

DATED: March 31, 2011.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE