IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FIRST UNITED BANK & TRUST,**

        Plaintiff,

v.                     //     CIVIL ACTION NO. 1:11CV31
                                  (Judge Keeley)

**THE SQUARE AT FALLING RUN, LLC,**
a West Virginia Limited Liability Company,

        Defendant,

**CITY OF MORGANTOWN and
MORGANTOWN BUILDING COMMISSION,**

        Objectors.

**ORDER ADOPTING-IN-PART REPORT AND RECOMMENDATION (DKT. 20), DENYING DEFENDANT'S MOTION TO DISMISS (DKT. 13), GRANTING-IN-PART PLAINTIFF'S MOTION TO APPOINT RECEIVER (DKT. 6), AND <u>REFERRING CASE TO MAGISTRATE JUDGE FOR ADDITIONAL PROCEEDINGS</u>**

**I. PROCEDURAL HISTORY**

On March 18, 2011, the plaintiff, First United Bank & Trust ("First United"), filed this action against the defendant, The Square at Falling Run, LLC ("Falling Run"), alleging a breach of Falling Run's financial obligations related to the development of certain real estate in Morgantown, West Virginia. On March 22nd, First United filed an "Emergency Motion to Appoint Receiver," requesting a prompt hearing to protect its security interest in Falling Run's lease of property from the Morgantown Building Commission, a public corporation.

The Court referred this motion to the Honorable John S. Kaull,

**FIRST UNITED BANK & TRUST v.**  1:11CV31
**THE SQUARE AT FALLING RUN, LLC**


**FIRST UNITED BANK & TRUST v.**  1:11CV31
**THE SQUARE AT FALLING RUN, LLC**

**ORDER ADOPTING REPORT AND RECOMMENDATION**
_____

United States Magistrate Judge ("Magistrate Judge Kaull"), who scheduled a hearing on the emergency motion for March 29th. Counsel for Falling Run noted a special appearance at the hearing, and also filed a "Motion to Dismiss for Lack of Jurisdiction." After taking evidence and testimony, and hearing argument from the attorneys, the Magistrate Judge issued a Report and Recommendation ("R&R") on March 31st recommending denial of Falling Run's motion to dismiss and the appointment of a receiver.

The R&R further recommended that Robert L. Johns, Esq. ("Johns"), who currently serves as the bankruptcy trustee for various entities sharing the same principals as Falling Run, as well as for one of those owner's personal bankruptcy estate, be appointed as the receiver. It also delineated the specific powers and obligations Johns would undertake should the Court appoint him as receiver. Following the issuance of the R&R, however, counsel for First United notified the Court that Johns had concluded a conflict of interest prevented him from serving as receiver. The parties have not proposed an alternative receiver.

Finally, the Magistrate Judge ordered First United to serve a copy of the R&R on the City of Morgantown and the Morgantown Building Commission (collectively, "Morgantown entities" or "City")

no later than April 5th, and further ordered that any party objecting to the R&R do so by April 6th. Falling Run filed its objections on the day the R&R issued, March 31st, and the Morgantown entities filed objections to the R&R on April 7th.[1]

Following a de novo review of the specific objections of Falling Run and the City, for the reasons that follow, the Court **ADOPTS** the R&R except for the selection of Johns as receiver, **DENIES** Falling Run's motion to dismiss, and **GRANTS-IN-PART** First United's motion to appoint a receiver, subject to the identification of a receiver acceptable to the Court. See 28 U.S.C. § 636(b)(1). The Court again **REFERS** this case to Magistrate Judge Kaull for further proceedings consistent with this Order.

## II. FACTUAL BACKGROUND

The following summary of the relevant facts in this case is drawn from the pleadings, exhibits and other filings of record, as well as the Court's judicial notice of the history of the property at issue. Falling Run was organized as a limited liability company under the laws of West Virginia with four brothers as members,

---

[1] Given that First United did not serve the Morgantown entities until April 5th, the Court considers the April 7th objections timely filed.

**FIRST UNITED BANK & TRUST v.**  1:11CV31
**THE SQUARE AT FALLING RUN, LLC**

**ORDER ADOPTING REPORT AND RECOMMENDATION**
_____

Kristian, Benjamin, Andrew and Monroe Warner ("the Warners"). The Warners were or are also principals of various other companies, including Augusta Apartments, LLC, and McCoy 6 Apartments, LLC. For many years, the entities controlled by the Warners, as well as the Warners individually, owned and operated numerous rental properties in the Morgantown area, including several older houses in the area at issue in this case – a valley named for the stream flowing through it, Falling Run. This area is adjacent to the main campus of West Virginia University and the downtown area of Morgantown. The Warners primarily rented their properties in the Falling Run area to university students.

Wishing to develop the Falling Run area into a more modern, mixed-use zone, the City entered into a complicated plan with the Warners that envisioned the demolition of the Warners' rental properties and construction of numerous residential, commercial and retail facilities. In addition, the plan – which the City approved under a special zoning procedure known as Planned Unit Development ("PUD") – called for the construction of a major parking facility and the rerouting of certain public streets.

The first phase of the PUD allowed the Warners, through Augusta Apartments, LLC, to construct a pair of apartment buildings

known as The Augusta on the Square. That project was completed.

The second phase of the project involved the construction of a major parking facility. To accomplish this undertaking, the Building Commission leased several parcels it owned in the area to Falling Run under a fifty-year lease agreement ("Ground Lease") that required Falling Run to construct a parking garage. Pursuant to the terms of the Ground Lease, the initial portion of the garage, known as the "Core Facility," was to be a 500-unit parking area to be completed by April 1, 2011. The Ground Lease specified that Falling Run's failure to construct the Core Facility by that date constituted an "Event of Default" that entitled the City to declare a default and initiate the process to extinguish Falling Run's leasehold interest.

Although the Warners completed the Augusta on the Square project, they encountered serious financial difficulty in the process. Thus, in December 2008, through Augusta Apartments and other entities they owned, the Warners obtained a $2.48 million line of credit from First United, which allowed them to pay off their debts to vendors and maintain their operations. Having already loaned the Warners substantially larger sums for their various business endeavors, First United required them to sign

personally as guarantors of the line of credit. Crucial to this litigation, Falling Run also became obligated as an additional guarantor. As part of Falling Run's guarantor arrangement, it pledged as security its leasehold interest in the City's property (the "Deed of Trust").

The cash infusion from the line of credit failed to save the Warner operations. McCoy 6 Apartments, LLC, filed bankruptcy on February 19, 2009. Meanwhile, the State of West Virginia revoked Falling Run's articles of organization in November of 2009. Augusta Apartments sought bankruptcy protection on February 19, 2010,[2] and Benjamin Warner filed personal bankruptcy on April 22, 2010.

The Warners and all of their entities failed to pay their numerous debts, including those sums owed to First United. No

---

[2]On April 8, 2011, the Board of Governors of West Virginia University approved a plan to buy the Augusta complex from the bankruptcy trustee, Johns. Press Release, West Virginia University, WVU Board Approves Purchase of Augusta Apartment Complex, Reviews 2012 Budget Outlook (Apr. 8, 2011) (available at http://wvutoday.wvu.edu/n/2011/4/8/wvu-board-approves-purchase-of-augusta-apartment-complex-for-11-million). The deal must still be approved by the Bankruptcy Court and the West Virginia Higher Education Policy Commission. Id. The purchase price, $11 million, was substantially less than the cost to construct it, over $20 million. See In re Augusta Apartments, LLC, No. 1:10BK303 (N.D.W. Va. Bankr. Feb. 19, 2010) (dkt. no. 1) (Voluntary Bankruptcy Petition); PNC Bank, N.A. v. Augusta Apartments, LLC, et al., No. 1:10CV20 (N.D.W. Va. Feb. 2, 2010) (dkt. no. 4) (Complaint).

construction was ever begun on the Core Facility. To this day, the leased property remains a vacant gravel lot used for hourly parking. All of the Warner entities, including Falling Run, failed to pay the line of credit when it came due on June 29, 2010. Finally, on March 18, 2011, First United filed this action against Falling Run as guarantor of the loan.

At the hearing before Magistrate Judge Kaull, Benjamin Warner could not state whether Falling Run had any cash assets at all, or even whether a bank account existed in its name. His testimony further established that the Warners were using the daily cash receipts from the parking operation to cover their own personal living expenses. Subsequent to the hearing, based in part on the lack of any progress towards the construction of the Core Facility, the City gave notice of default to Falling Run under the terms of the Ground Lease.

### III. ANALYSIS OF OBJECTIONS

First United seeks the appointment of a receiver, claiming 1) that Falling Run's interest in the leased property represents the bank's sole remaining security for Falling Run's guaranty obligations, and 2) that its security is threatened by Falling Run's default under the Ground Lease. Both Falling Run and the City

object to this request, but on different grounds. Despite these objections, the Court concludes that appointment of a receiver is appropriate.

### A.   Falling Run's Objections

Falling Run argues first that Magistrate Judge Kaull failed to correctly apply the law governing preliminary injunctive relief. It further contends that First United will not suffer harm from the loss of its security interest; that the appointment of a receiver would be futile; that First United does not face imminent harm; and that Johns should not be appointed as a receiver. Falling Run's objections, however, do not extend to the recommended denial of its motion to dismiss. The Court will address each of these objections in turn.

### 1.   Preliminary Injunctive Relief and the Appointment of Receivers

Falling Run's contention that Magistrate Judge Kaull did not correctly apply the law governing preliminary injunctive relief is misplaced as the R&R only provided a recommendation regarding the appointment of a receiver. While both injunctive relief and the appointment of a receiver may be granted as preliminary equitable remedies, the Federal Rules of Civil Procedure treat them differently. See Fed. R. Civ. P. 65(a)(governing preliminary

injunctive relief), and Fed. R. Civ. P. 66 (governing appointment of a receiver).

These remedies serve different purposes. A preliminary injunction affords a party temporary relief "that can be granted permanently after trial." Real Truth About Obama, Inc. v. Federal Election Comm'n, 575 F.3d 342, 345 (4th Cir. 2009) (quoting Winter v. Natural Resources Defense Council, Inc., 129 S. Ct. 365, 376 (2008)), vacated on other grounds by 130 S. Ct. 2371 (2010). A receiver, on the other hand, may be appointed for the limited purpose of safeguarding disputed assets. See Liberte Capital Group, LLC v. Capwill, 462 F.3d 543, 551 (6th Cir. 2006)(citing 13 Moore's Federal Practice ¶¶ 66.02-03 (3d ed. 1999)).

In light of these differences, Magistrate Judge Kaull correctly applied the eight-factor analysis governing the appointment of a receiver. See Brill & Harrington Investments v. Vernon Savings and Loan Association, 787 F. Supp. 250, 253-54 (D.D.C. 1992) (listing the eight factors federal courts typically consider when determining whether to appoint a receiver) (citing New York Life Ins. Co. v. Watt West Invest. Corp., 755 F. Supp. 287, 292 (E.D. Cal. 1991)). The eight-factor analysis undertaken by Magistrate Judge Kaull closely resembles the four-part test for

preliminary injunctive relief. Three of the four parts of the test for preliminary injunctive relief are also considered under the eight-factor analysis for appointing a receiver. Compare Real Truth, 575 F.3d at 347 (preliminary injunction) with Brill & Harrington, 787 F. Supp. at 253-54 (appointment of a receiver).

The only factor included in the four-part test for preliminary injunctive relief that is not included in the eight-factor analysis for the appointment of a receiver is the consideration of the public interest. When determining whether to grant preliminary injunctive relief, district courts must consider the "'public consequences in employing the extraordinary remedy of injunction.'" Real Truth, 575 F.3d at 346 (quoting Winter v. Natural Resources Defense Council, Inc., 129 S. Ct. 365, 376-77 (2008)). Because Magistrate Judge Kaull correctly applied the law governing the appointment of a receiver, he did not need to consider the public interest. Nevertheless, even when the public interest is considered, this factor does not weigh against such an appointment.

Here, the appointment of a receiver will have few, if any, public consequences. Falling Run is the lessee of lands owned by the Morgantown Building Commission, a public entity. A receiver's management of Falling Run's leasehold interest will neither enhance

10

nor diminish the rights and remedies of the City of Morgantown or the Morgantown Building Commission; appointment of a receiver will only place Falling Run in the hands of different management. Accordingly, such an appointment would not harm the public or generate public consequences, while the failure to appoint a receiver could deeply prejudice any rights or security interest First United may have in the Ground Lease.

**2.  First United's Security Interest in the Ground Lease**

Falling Run also asserts that the Court should not appoint a receiver because First United will not be harmed by the loss of its security interest. In support of this assertion, it emphasizes Magistrate Judge Kaull's finding in the R&R that the Warner entities are indebted to First United for approximately $12 million, and that First United holds security interests in thirty-three parcels of land in which the Warners have some interest, having an approximate value of $20 million.

Falling Run's objection, however, misapprehends the nature of the relief sought by First United. Falling Run is a guarantor of a $2,480,000 non-revolving commercial line of credit, on which the principal borrowers have drawn down approximately $1.1 million. This balance indisputably remains overdue and unpaid. In connection

with this loan transaction, First United purportedly received Falling Run's interest in the Ground Lease as security for its obligations as a guarantor. Based on the inaction of Falling Run, however, First United faces the loss of that security, the only remaining collateral not subject to the various Warner bankruptcies. Thus, First United seeks to provide the security interest Falling Run provided as a guarantor.

### 3. The Futility of Appointment

Falling Run also contends that the appointment of a receiver would be futile because a receiver will not be able to save the Ground Lease from its eventual termination. In other words, Falling Run objects to Magistrate Judge Kaull's conclusion that the appointment of a receiver provides First United with a "chance" to preserve the Ground Lease.

As Benjamin Warner testified, Falling Run has no means or plans to construct the Core Facility or otherwise cure its default. It has neither the money nor, apparently, the motivation to attempt to save its interest in the Ground Lease. Of course, the appointment of a receiver by no means will ensure the preservation of the Ground Lease, a fact Magistrate Judge Kaull observed in the R&R when he noted that such an appointment provides an imperfect

solution and will itself constitute an "Event of Default" under the lease. See Ground Lease, ¶ 23(n) (dkt. 24-1). Nevertheless, unlike Falling Run's current management, a receiver will presumably take some action to pursue an agreement with the City that would forestall the loss of the leasehold. Accordingly, while a receiver's prospects of saving the Ground Lease are uncertain, such an appointment provides First United with its only opportunity to preserve any security interest it may have.

### 4.   The Imminence of Harm

Falling Run objects to Magistrate Judge Kaull's analysis regarding the imminence of harm to First United, emphasizing that the R&R was issued before the Morgantown Building Commission sent out a notice of default. While it is true that the Morgantown entities had not issued a notice of default when Magistrate Judge Kaull filed his R&R, there was no doubt at the time that Falling Run would not construct the Core Facility by April 1, 2011.

In any event, this objection is now moot. Prior to filing its objections on April 7th, the City sent notices of default to Falling Run. See Objections of Morgantown Entities at 10 n.21 (dkt. 24). Elsewhere in its objections, the City clearly states that it intends to treat the lease as void and retake possession of the

property. Id. at 10. Falling Run indisputably has no means to construct the Core Facility, and the Morgantown entities' stated intentions place First United in imminent danger of losing any security interest it may have in the Ground Lease.

### 5. Identification of a Proper Receiver

Finally, Falling Run objects to Magistrate Judge Kaull's recommendation that the Court appoint Johns to serve as a receiver. As already noted, Johns is unable to serve in this capacity, thus mooting Falling Run's objections. The Court will refer this case to Magistrate Judge Kaull with directions to take all actions necessary to determine a suitable receiver.

### B. City's Objections

Although the City is not a party to this case, and does not seek intervenor status, it filed objections after being served with a copy of the R&R. It now argues that it is an indispensable party to this litigation based on its fee simple ownership of the real property at issue. It also contends that the Deed of Trust purporting to pledge Falling Run's leasehold to First United is void, and First United thus has no security interest to preserve through the appointment of a receiver.

Despite the City's undisputed interest in the property, it

14

clearly will suffer no legal or practical prejudice through the appointment of a receiver. Furthermore, the Court need not resolve at this juncture questions the City raises regarding the fundamental validity of the Deed of Trust.

1. **City as a Necessary or Indispensable Party**

At the hearing, Falling Run argued that the City was a necessary party and the Court should dismiss the case because First United had failed to join it. Magistrate Judge Kaull disagreed, reasoning that the dispute in this case is between First United and Falling Run, and that the appointment of a receiver would not in any way affect the City's rights in the property at issue or hinder its ability to pursue whatever remedies might be available to it due to Falling Run's breach of the Ground Lease.

The City, however, insists that, under Fed. R. Civ. P. 19, it "claims an interest relating to the subject of the action and is so situated that disposing of the action . . . may . . . as a practical matter impair or impede [its] ability to protect the interest." While the Court agrees that the City clearly possesses a valid claim related to the subject of this litigation, the appointment of a receiver will in no way impair its ability to protect that interest.

**FIRST UNITED BANK & TRUST v.**  1:11CV31
**THE SQUARE AT FALLING RUN, LLC**

**ORDER ADOPTING REPORT AND RECOMMENDATION**
_____

The Supreme Court of Appeals of West Virginia has stated unequivocally that

> [w]hen a court proceeding directly affects or determines the scope of rights or interests in real property, any persons who claim an interest in the real property at issue are indispensable parties to the proceeding. Any order or decree issued in the absence of those parties is null and void.

Syl. Pt. 2, O'Daniels v. City of Charleston, 490 S.E.2d 800 (W. Va. 1997).

Although federal law governs the Court's interpretation of Rule 19 in this diversity case, the principle of law announced in O'Daniels, that no party may be deprived of its property rights without an opportunity to be heard, is compelling. Nevertheless, the City is not indispensable to this action at this time inasmuch as nothing contained in the proposed appointment of a receiver "affects or determines the scope of rights or interests in real property." Id. Instead, the receiver will take control of Falling Run, whose interest in the lease remains unchanged.

Should the City find it necessary to bring an action to enforce its rights under the Ground Lease, appointment of a receiver would not impair this right. "Trustees . . . may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with

16

such property." 28 U.S.C. § 959(a).

Nothing in the relief sought by First United bars the City from any action it otherwise could take against Falling Run or, for that matter, First United. The receiver will merely step into the shoes of the Warners to manage the affairs of Falling Run in a manner they have proven themselves unable or unwilling to do.

Should this case progress further, it is foreseeable that the City may become a vital party. In O'Daniels, the state Supreme Court, reviewing its prior decisions, addressed the distinction between preliminary and final relief and its effect on joinder of parties. It noted that it had previously held that, "in an action to quiet title, 'all parties who have or claim any interest, right or title under the instrument, or instruments, of writing sought to be canceled, should be made parties defendant.'" Id. at 805 (quoting Syl. Pt. 1, Bonafede v. Grafton Feed & Storage Co., 94 S.E. 471 (W. Va. 1917)).

In contrast, however, it was error for a trial court to dissolve its preliminary injunction on the grounds that an indispensable party had not been sued. O'Daniels, 490 S.E.2d at 805 (citing United Fuel Gas Co. v. Morley Oil & Gas Co., 131 S.E. 713 (W. Va. 1926)). Similarly, in the case at bar it would be

17

improper to refuse to appoint a receiver at this juncture solely because a final resolution of the case may require the joinder of the City.

Should First United attempt to foreclose on its security interest in the leasehold estate, the City at that point would be an essential party because it claims an interest in the lease, specifically, that Falling Run is in default and that First United's purported security interest is void due to the non-encumbrance provisions of the Ground Lease. <u>See</u> Ground Lease, ¶ 13 (dkt. 24-1). Like a preliminary injunction, however, the appointment of a receiver at this early stage does not constitute final relief as to any property interest and will not prejudice the City's legal or equitable rights. The Court does not purport here to enter an "order or decree" resolving questions of ownership. Syl. Pt. 2, <u>O'Daniels</u>. Thus, First United's failure to join the City does not prevent the Court from granting the bank's motion to appoint a receiver.

**2.    Validity of the Deed of Trust**

The City's ultimate argument is that a receiver should not be appointed because First United actually has no security interest to protect. Noting that the Ground Lease provides for only certain

18

financing arrangements related to the construction of the Core Facility and related improvements, it argues that Falling Run's encumbrance of its interest in the Ground Lease under the Deed of Trust with First United does not fall within this limitation.

The Ground Lease provides that Falling Run

> may create encumbrances upon the leasehold estate . . . for the purpose of financing the construction of the Core Facility, Parking Garage, and any other buildings or improvements on the Leased Premises, including, without limitation, leasehold deeds of trust or security agreements. [Falling Run] shall not have the right, authority, or power to encumber such leasehold estate for any other purposes.

Ground Lease (dkt. 24-1), ¶ 13.

Neither Falling Run nor First United has responded to this issue. The Court, however, concludes that it need not address whether First United has a valid security interest in the Ground Lease at this time. First United's emergency motion seeks only the appointment a receiver for Falling Run to protect any security interest it may have. Its motion does not ask the Court to determine the true owner of the lease.

### IV. CONCLUSION

No party objected to the portion of the R&R recommending that Falling Run's motion to dismiss be denied, and, accordingly, the Court **DENIES** that motion (dkt. 13). Further, for the reasons

discussed, it **GRANTS-IN-PART** the motion to appoint a receiver (dkt. 6), and **REFERS** this matter to the Honorable John S. Kaull, United States Magistrate Judge, to determine a suitable receiver to take control of Falling Run and the leased premises.

It is so **ORDERED**.

The Court directs the Clerk to transmit copies of this Order to counsel of record and to the Honorable John S. Kaull, United States Magistrate Judge.

DATED: April 25, 2011.

>                    /s/ Irene M. Keeley
>                    IRENE M. KEELEY
>                    UNITED STATES DISTRICT JUDGE